**SAMSUNG ELECTRONICS AMERICA, INC., Plaintiff–Appellant,**

**v.**

**The UNITED STATES, Defendant–Appellee.**

**No. 96–1127.**

United States Court of Appeals, Federal Circuit.

Feb. 3, 1997.

Thomas Joseph Kovarcik, Irving A. Mandel, Counselor at Law, New York City, argued, for plaintiff-appellant. With him on the brief were Irving A. Mandel, and Jeffrey H. Pfeffer.

Bruce N. Stratvert, Commercial Litigation Branch, Civil Division, Department of Justice, New York City, argued, for defendant-appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General and David M. Cohen, Director, Washington, D.C., and Joseph I. Liebman, Attorney in Charge, International Trade Field Office, New York City. Of counsel on the brief was Mark G. Nackman, Office of Assistant Chief Counsel, International Trade Litigation, U.S. Customs Service, New York City.

Before MAYER, MICHEL and RADER, Circuit Judges.

Opinion for the court filed by Circuit Judge MICHEL. Dissenting opinion filed by Circuit Judge MAYER.

MICHEL, Circuit Judge.

Samsung Electronics America, Inc. ("Samsung") appeals from the Order of the United States Court of International Trade entered October 26, 1995 in *Samsung Electronics America, Inc. v. United States,* 904 F.Supp. 1403 (C.I.T. 1995), in which the trade court (a) denied Samsung's motion for summary judgment on its claims for duty refunds due to the diminution in value of merchandise it imported from its parent corporation, the manufacturer, that contained latent manufacturing defects upon importation, and (b) granted the government's cross-motion for summary judgment. The appeal was submitted for our decision following oral argument on December 3, 1996. Because we hold the trade court misinterpreted the sales contracts for the SAMSUNG electronic equipment by incorrectly concluding that Samsung had ordered both defect-free and defective equipment, we reverse. We remand for a determination of the allowance to be made under the applicable regulation for reduced value because of the defects.

## BACKGROUND

During the time relevant here, 1987 to 1990, Samsung imported various types of electronic equipment manufactured by its parent company, Samsung Electronics Co., Ltd. ("manufacturer") in Korea. Samsung then resold the equipment bearing both companies' brand name SAMSUNG to consumers in America. These resales were covered by consumer warranties that the equipment was free of manufacturing defects.

The United States Customs Service ("Customs") assessed tariffs based on the transaction value of the imported equipment. This transaction value was determined using the price actually paid by Samsung when it purchased the equipment from the manufacturer, as provided in 19 U.S.C. § 1401a (1994). As part of the sales contracts, Samsung and the manufacturer entered into Servicing Agent Agreements ("service agreements") which stated "the Products exported to the United States are *occasionally* in need of the inspection, repair, refurbishing, and such other customer requested services . . ." (emphasis added). The service agreements obligated the manufacturer to reimburse Samsung up to 5% of the total purchase price per year

for the cost of these inspections, repairs and refurbishings.

During the time covered by these sales contracts and service agreements, some of the imported electronic equipment was found to have contained latent defects when imported. Samsung either sold the equipment containing such manufacturing defects at a discount and with the SAMSUNG label removed, or repaired it in the United States either before sale or under the consumer warranties when consumers sent it back. Samsung's cost accounting system kept track of these losses and repair costs. When consumers asserted their rights under their consumer warranties with Samsung, only those defects that existed at the time of importation were repaired and considered repair costs in Samsung's accounting system. Samsung asserted its rights under the service agreements and the manufacturer reimbursed Samsung for its losses incurred in the discounted sales and the costs incurred to repair the defects. This reimbursement was equal to 4.7% of the total purchase price.

Samsung filed a claim with Customs under what are now 19 C.F.R. § 158.12 and 19 U.S.C. § 1401a(b)(3)(A)(i) for the valuation of the defective merchandise and, consequently, the duties assessed, to be reduced by a reasonable allowance for the diminished value due to the latent manufacturing defects. Customs rejected both Samsung's claim and its subsequent protest. Samsung then brought the instant action in the Court of International Trade. The court granted the government's motion for summary judgment and Samsung timely appealed. We have jurisdiction under 28 U.S.C. § 2645(c) (1994).

## DISCUSSION

Samsung argues that the dutiable value of the defective merchandise must be reduced pursuant to either 19 C.F.R. § 158.12 or 19 U.S.C. § 1401a(b)(3)(A)(i).[1] The regulation, 19 C.F.R. § 158.12 (1990), states:

Merchandise which is subject to ad valorem or compound duties and found by the district director to be partially damaged at the time of importation shall be appraised in its condition as imported, with an allowance made in the value to the extent of the damage.

 Customs has asserted that this regulation applies only to defective merchandise that is lesser merchandise than that which was ordered.[2] As the agency charged with administering the statute and related regulations, Customs' interpretation of its own regulation, assuming that Congress has not spoken directly to the issue, is entitled to deference so long as it is reasonable. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Since we conclude Congress has not spoken directly to this issue, we defer to Customs' interpretation and hold that 19 C.F.R. § 158.12 applies when the merchandise received is worth less than the merchandise that was ordered.

 The questions therefore become: What did Samsung order in the sales contracts? Was it only defect-free merchandise? Or was it a mix of defect-free and defective merchandise? The trial court analyzed as follows:

Having determined that 19 C.F.R. § 158.12 applies only when an importer receives merchandise that is of a lesser quality than that for which he contracted, the Court turns to consider whether the regulation authorizes a reduction in the value of the subject merchandise. When Samsung America purchased the subject merchandise from Samsung Korea, it did not contract only for defect-free merchandise. Samsung America also entered into the Agreements under which it received compensation for loss and repair costs resulting from defective merchandise. (Pl.'s Mot. For Summ. J., Ex. 1.) Hence, Sam-

---

1. Since we resolve this case under section 158.12, we decline to reach Samsung's section 1401a argument.

2. *See* Customs Service Decision 84–11 ("This ruling holds that relief may be authorized ... pro-

vided that the importer has submitted clear, concise and convincing evidence to support a claim that the merchandise purchased and appraised as one quality was in fact of a lesser quality.").

sung America contracted to receive the following items from Samsung Korea: (1) defect-free merchandise; and (2) defective merchandise for which it had a contractual right to compensation for loss or repair. When the merchandise arrived in the United States, Samsung America received no less than that for which it had contracted. Consequently, the Court finds that 19 C.F.R. § 158.12 does not entitle Samsung America to a reduction in value.

*Samsung,* 904 F.Supp. at 1405. Thus, in a single, conclusory paragraph, the trade court, based solely on the fact of the service agreements, held that Samsung had ordered both defect-free and defective merchandise. We disagree with the trade court's contract interpretation.

■■■ Contract interpretation is ordinarily an issue of pure law, which we review entirely de novo. *C. Sanchez & Son, Inc. v. United States,* 6 F.3d 1539, 1544 (Fed.Cir. 1993); *Interstate Gen. Gov't Contractors v. Stone,* 980 F.2d 1433, 1434 (Fed.Cir.1992). In interpreting a written contract, the intent of the parties, for instance as evidenced by the written instruments forming the contract, is of primary concern. *See Ralden Partnership v. United States,* 891 F.2d 1575, 1577 (Fed.Cir.1989). Here, the trial court misconstrued the sales contracts, ignoring Samsung's consumer warranties, its relationship to the manufacturer, and commercial reality.

First, the very service agreements relied on by the trade court belie its interpretation. The agreements do not show that Samsung ordered defective as well as defect-free merchandise. Rather, they show that Samsung ordered only perfect merchandise and contracted specifically to address the inevitability that, despite its order, "occasionally" some of the merchandise delivered would contain latent manufacturing defects. The contract's explicit recognition of the reality of mass production (or, for that matter, any kind of production), namely that in some products there will be manufacturing defects, does not mean that Samsung "ordered" defective merchandise or both defect-free and defective merchandise. The government agrees that the contracts did not specifically call for "defective" merchandise (or equivalent terms),

and we think the service agreements support the interpretation that Samsung sought, and its parent company, the manufacturer, agreed to deliver, wholly defect-free merchandise, effectively so guaranteeing by agreeing to reimburse for any defects, up to 5% of total sales per year.

Second, Samsung expressly warranted defect-free merchandise to its customers. The existence of these consumer warranties demonstrates that Samsung is in the business of selling defect-free merchandise and so holds itself out. That was its intent and its customers' expectation. After all, the electronic equipment bore the brand name SAMSUNG, linking it with both Samsung America and Samsung Electronics of Korea.

Finally, the close corporate and functional relationship of the two companies supports the inference that only defect-free merchandise was ordered in these sales contracts. Samsung America is essentially the American distributor for Samsung Electronics of Korea. It makes no commercial sense for Samsung to purposefully deal in defective goods, thereby risking customer dissatisfaction upon receiving such goods despite purchasing brand-name equipment. For Samsung to order defective merchandise from its parent company would be extremely poor business practice.

Since all indications are that Samsung ordered only defect-free merchandise and we see nothing that supports the trade court's contrary contract interpretation, we hold that these sales contracts call for *only* defect-free merchandise.

The sole authority relied upon by the trial court, *Esprit de Corp v. United States,* 817 F.Supp. 975 (C.I.T. 1993), supports (at least in dicta) Customs' interpretation that section 158.12 applies only when an importer receives lesser goods than it ordered. However, the decision is irrelevant because, as noted above, we hold that Customs' interpretation of its regulation is reasonable. The *Esprit* decision therefore cannot aid our disposition of this appeal which turns instead on the interpretation of the contracts at hand. Neither can it support the trade court's interpretation of the sales contracts because the decision has not been shown to

involve comparable contracts. Therefore we cannot agree with the ruling below and the government's argument here that *Esprit* compels rejection of Samsung's claim.

The dissent states that "Samsung did not order defective merchandise, but it did order merchandise knowing some of it would contain latent defects." That is, Samsung expected some defective merchandise. The dissent concludes from this that section 158.12 does not apply. The difference between the dissent's analysis and our own is that we believe that Samsung "ordered" defect-free merchandise by requesting brand name merchandise and contractually ensuring the delivery of defect-free merchandise or reimbursement through the servicing agreements.[3] Samsung paid for defect-free merchandise and that is, through reimbursement, what Samsung effectively received. We do not believe that the mere recognition on Samsung's part that, at the moment of importation, some of the merchandise unavoidably would contain latent manufacturing defects, vitiates the mutual intent of Samsung and the manufacturer to contract for defect-free merchandise. Since Customs' interpretation of the regulation correctly focuses on what was *ordered*, we believe the focus of the dissent on what was *expected* to be mistaken. Thus, the dissent incorrectly focuses on what "Samsung thought it would receive" and what it "anticipated."

■ Furthermore, the fact that Samsung ultimately received the economic equivalent of perfect goods (through reimbursement) does no violence to Customs law or policy. It is undisputed that some of the goods Samsung imported contained latent manufacturing defects at the time of importation. They were therefore worth less than defect-free goods. Duties are assessed on the value of goods *as imported.* Here, the value added to the goods (via repair) was added in the United States after importation. Value subsequently added in the United States is not dutiable. *See* 19 U.S.C. § 1401a (d)(3)(A)(v) (1994).

We therefore reverse the trial court's summary judgment that section 158.12 does not apply, and remand for a determination of the "allowance [to be] made in the value to the extent of the damage." 19 C.F.R. § 158.12.[4]

*REVERSED AND REMANDED.*

### COST

Each party to bear its own costs.

MAYER, Circuit Judge, dissenting.

Because the Court of International Trade correctly concluded that Samsung Electronics America, Inc. ("Samsung") received the quality of goods it ordered, I would affirm.

Samsung purchased and imported televisions, stereos, video cassette recorders, microwave ovens, de-humidifiers, and other electronic articles from Samsung Electronics Co., Ltd. ("manufacturer") in Korea. Both parties entered into annual Servicing Agent Agreements requiring the manufacturer to reimburse Samsung on a monthly basis for the cost of Samsung's inspection, repair, refurbishing and other customer-related services. This reimbursement was limited to five percent of the total value of the imported products over the course of each year.

Pursuant to 19 U.S.C. § 1401a(b), the Customs Service appraised the imported merchandise on the basis of the transaction value, using the price Samsung actually paid the manufacturer for the merchandise. Samsung paid the assessed duties and sold the merchandise along with limited warranties to its customers. Some of the merchandise was returned as defective under the warranties. The manufacturer reimbursed Samsung for

---

3. We decline to comment on the interpretation of contracts where there might not be service agreements or consumer warranties or any of the other factors we consider here. The legal question, as mandated by the Customs interpretation of the regulation, though, remains the same: what did the importer order?

4. For purposes of the remand, we specially note that only those defects in existence at the time of importation qualify for an "allowance" in value. Samsung thus bears the burden of proving, for instance, that the costs to repair defects under consumer warranties were incurred to repair defects in existence at importation, and not, for instance, those caused by its own mishandling or by consumer misuse of the equipment.

losses and repair costs associated with these warranty returns.

Samsung sought a reduction in Customs' appraisal of, and a concomitant refund for, the amount of duties it paid for the defective merchandise. Customs refused to adjust the duties. The Court of International Trade affirmed Customs' refusal, finding that Samsung received the quality of goods it ordered under its contract with the manufacturer. *Samsung Electronics America, Inc. v. United States,* 904 F.Supp. 1403 (C.I.T.1995). As it did below, Samsung argues on appeal that it bargained for first quality defect-free merchandise. It believes that under 19 C.F.R. § 158.12, the existence of latent defects requires Customs to reduce the appraised dutiable value of the merchandise and refund the difference.

Because contract interpretation is a question of law, we must determine de novo whether the contract between Samsung and its manufacturer anticipated the delivery of wholly defect-free merchandise or the delivery of some defect-free merchandise as well as some that may be defective. *Hughes Communications Galaxy, Inc. v. United States,* 998 F.2d 953, 957 (Fed.Cir.1993). We look to the plain language of the contract and interpret it in a manner that gives meaning to all of its provisions and makes sense. *McAbee Constr. Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996).

In support of its argument that the contract called for first quality defect-free merchandise, Samsung points only to the affidavit of Thomas Tesi, its General Manager of National Distribution. This affidavit states in relevant part:

The entered value of the merchandise was the price paid or payable for first quality, defect-free merchandise.

That price paid or payable did not contain any deduction or allowance for latent defects in the merchandise.

[The manufacturer] guaranteed to [Samsung] that the subject merchandise would be of first quality and defect-free as ordered. This guaranty was set forth in a contract between [the manufacturer] and Samsung known as a 'Service Agreement'.... The Service Agreements set

forth quality standards for the merchandise and provided for their enforcement by obligating [the manufacturer] to reimburse [Samsung] for any losses or costs of repair that [Samsung] incurred as a result of defects in the merchandise.

Such merchandise was not worth the price that [Samsung] had paid to [the manufacturer] for it.

Tesi's self-serving assertions add nothing to our understanding of the contract or to the parties' contemporaneous intentions. Without some explanation about how or why the cost of defective goods was imposed on one party and not the other, Tesi's statements cannot favor one party's interpretation over the other's. Nor do his statements serve as evidence of Samsung's intentions, absent some contemporaneous explanation as to why Samsung thought it would receive defect-free goods when standard industry practices inevitably resulted in delivery of some defective merchandise.

In contrast to these unhelpful statements, the following clauses in the Servicing Agency Agreements illustrate that the parties anticipated the delivery of both defect-free and some defective merchandise.

Whereas the Products exported to the United States are occasionally in need of the inspection, repair, refurbishing, and such other customer requested services....

For the Services rendered [by Samsung] hereunder, [the manufacturer] shall pay [Samsung] on monthly basis a service charge the amount of which shall not exceed five percent (5%) of the total amount of the Products exported to the United States in a relevant year....

In fact, and as confirmed by Samsung, Samsung received first class merchandise that was defect-free, as well as defective merchandise amounting to four-point-seven percent (4.7%) of the total amount of the products; almost exactly what it had anticipated. On these facts, it is difficult to imagine how Samsung can now claim that it ordered or anticipated completely defect-free merchandise or that it paid duties based on the receipt of defect-free merchandise. Both

commercial reality and the specifics of these transactions show that Samsung knew exactly what it ordered and that it anticipated what it received. In contrast, this court denies these facts by relying on the ex post facto self-serving statements of a party about what it would like to have received in a perfect world and by creating a false choice between two possibilities: ordering defect-free merchandise or ordering defective merchandise. Neither possibility accurately describes the contract between Samsung and its manufacturer. Samsung did not order defective merchandise, but it did order merchandise knowing some of it would contain latent defects.